2023 IL App (1st) 191917-U

SIXTH DIVISION
February 3, 2023

No. 1-19-1917

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

---

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 15367 |
| | ) | |
| RANDON WALKER, | ) | Honorable |
| | ) | Lawrence Flood, |
| Defendant-Appellant. | ) | Judge, presiding. |

---

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices C.A. Walker and Tailor concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction for first degree murder and reject his claim that reversal is required because the State committed prosecutorial misconduct during rebuttal closing argument.

¶ 2    Following a jury trial, defendant Randon Walker was found guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) and sentenced to 45 years in prison. On appeal, Mr. Walker contends that he was denied a fair trial where the State repeatedly committed misconduct during rebuttal closing argument. We affirm.

¶ 3                           I. BACKGROUND

¶ 4     Mr. Walker was charged by indictment with six counts of the first degree murder of Reuben Austin with a firearm. The evidence at trial generally showed that Mr. Walker and Mr. Austin were involved in a game of dice at the corner of Lawndale Avenue and Augusta Boulevard during the early morning of September 20, 2013. The game devolved and ended with Mr. Walker and Mr. Austin fighting, then ultimately Mr. Walker fatally shooting Mr. Austin. Mr. Walker's defense at trial was that he acted in self-defense. We will detail the descriptions of what occurred by several of the witnesses, since these descriptions varied in some respects.

¶ 5                      A. The State's Case-in-Chief

¶ 6                           1. Darianne Perkins

¶ 7     Darianne Perkins, Mr. Austin's cousin, testified that she had a child with Mr. Walker. She said that Mr. Austin was known as "Little T."

¶ 8     She testified that during the dice game, Mr. Walker and Mr. Austin began arguing. After the argument began, Mr. Austin, Venson Franklin, and Devontae Thompson drove to a liquor store. They returned less than five minutes later. Mr. Walker and Mr. Austin resumed arguing, and Mr. Franklin attempted to separate them.

¶ 9     Soon after that, Mr. Walker's cousin, Terria Wright, arrived with her friend, Tatiana McCallum, and became involved in the argument. Ms. Wright said, "[a]in't going to be no talking," and Mr. Franklin moved to speak with her. Mr. Austin then crossed the street and Mr. Walker discharged a firearm at him from "[n]ot that far" away. Mr. Austin ran from Mr. Walker, who shot him approximately five times. Mr. Walker said, "which one of you b*** a*** n*** want it next," before another individual, who Ms. Perkins only knew as "BD," took the firearm from him. Mr. Thompson then "grabbed" Mr. Walker, shook him, and asked what he did. Ms. Perkins did not see

Mr. Austin, Mr. Franklin, or Mr. Thompson display a weapon.

¶ 10    Mr. Walker told Ms. Perkins, "b***, come on," and they walked to Mr. Walker's mother's house. There, Mr. Walker informed his mother that "he hurt his friend." Ms. Wright drove Mr. Walker and Ms. Perkins to a hotel outside the city. In the vehicle, Mr. Walker said, "I can't believe that I did it," and, "if Little T made it, [I'm] going to push [my] life around." Ms. Perkins later learned that Mr. Austin died.

¶ 11    On September 24, 2013, Ms. Perkins and Mr. Franklin met with Detective Mike Mancuso. On May 12, 2014, Ms. Perkins provided a videotaped statement. In that statement, she denied that Mr. Walker said anything to BD when BD took the firearm from him. On August 15, 2014, Ms. Perkins testified before the grand jury. The State read a portion of the transcript, which Ms. Perkins agreed reflected her prior testimony. Before the grand jury, Ms. Perkins stated, "BD walked up and BD was like boy, give me that m*** f*** gun. *** Then BD snatched the gun from him and [Mr. Walker] was like I got another one. I'm fine."

¶ 12    On cross-examination, Ms. Perkins stated that Mr. Walker and Mr. Austin were playing dice and began "tussling." Ms. Perkins did not see Mr. Austin push Mr. Walker against a fence. After the "tussling," Mr. Austin left with Mr. Franklin and Mr. Thompson, and Mr. Walker walked toward Monticello Avenue. When everyone returned, Mr. Walker and Mr. Austin resumed arguing. Ms. Perkins denied seeing Mr. Austin remove a firearm from his pants after he crossed the street. Mr. Walker shot Mr. Austin while Mr. Austin was facing away. During the drive to the hotel, Mr. Walker cried. Ms. Perkins did not recall telling Detective Mancuso that she saw Mr. Austin push Mr. Walker against a fence, and stated they were not having a fistfight.

¶ 13    Defense counsel confronted Ms. Perkins with her grand jury testimony that "Little T skipped across the street, ran and pulled the gun out of his pants and he started shooting." Ms.

Perkins repeated that she never saw Mr. Austin with a firearm. The court commented that Ms. Perkins "seem[ed] confused about the question." Ms. Perkins then affirmed that before the grand jury, she testified that she saw "Randon" shooting.

¶ 14    On redirect examination, Ms. Perkins testified that Mr. Walker's given name was "Randon," and his street name was "Shorty Lo." Ms. Perkins then clarified that she informed the grand jury that after Mr. Austin "skipped across the street," Mr. Walker removed the firearm from his pants and shot Mr. Austin.

¶ 15                                         2. Tatiana McCallum

¶ 16    Tatiana McCallum testified that she had known Ms. Wright for 17 or 18 years. On September 20, 2013, Ms. McCallum and Ms. Wright planned to visit a club with BD and a person named Bernard. Ms. Wright drove the group to the area of Lawndale Avenue and Augusta Boulevard because she needed money from Mr. Walker. Ms. Wright stopped the vehicle to speak with Mr. Walker, who was with Ms. Perkins. Ms. McCallum saw Mr. Austin, Mr. Franklin, and Mr. Thompson approach Mr. Walker. Mr. Austin was aggressive, but did not touch Mr. Walker, although they "were close."

¶ 17    Ms. Wright and Ms. McCallum exited the vehicle and Ms. Wright moved to "break them up." Ms. McCallum was six or seven feet from Mr. Walker and Mr. Austin. Mr. Austin then removed his shirt and the argument continued. Ms. McCallum did not observe Mr. Austin, Mr. Franklin, or Mr. Thompson carrying weapons. As Mr. Austin walked toward Mr. Walker, Mr. Walker shot him with a silver revolver four or five times. At some point, Mr. Austin turned and ran from Mr. Walker, who continued shooting at him.

¶ 18    Almost a year later, Ms. McCallum spoke with Detective Mancuso and an assistant state's attorney (ASA) and made a videotaped statement. Ms. McCallum testified that, in the statement,

she never mentioned Mr. Franklin or Mr. Thompson approaching Mr. Walker with Mr. Austin because she was not paying attention to what they were doing, but she was "pretty sure they had words to say, too."

¶ 19    On cross-examination, Ms. McCallum stated that after Mr. Austin, Mr. Franklin, and Mr. Thompson exited the vehicle, they "aggressively" approached Mr. Walker. She believed Mr. Austin, Mr. Franklin, and Mr. Thompson would attack Mr. Walker. Ms. McCallum did not see Mr. Walker with a firearm until the shooting began.

¶ 20    On redirect examination, Ms. McCallum testified that when she stated Mr. Austin, Mr. Franklin, and Mr. Thompson exited the vehicle "aggressively," she meant they "got out of the [vehicle] fast and they [were] talking, like they [were] arguing, aggression." Mr. Walker was speaking aggressively as well. Ms. McCallum did not remember telling Detective Mancuso that she believed Mr. Austin, Mr. Franklin, and Mr. Thompson would attack Mr. Walker.

¶ 21                                      3. Venson Franklin

¶ 22    Venson Franklin testified that he considered himself to be like a cousin to Mr. Austin, and had known Mr. Walker for at least 20 years. Ms. Wright was the mother of Mr. Franklin's child.

¶ 23    On September 20, 2013, Mr. Franklin was playing dice with Mr. Walker, Mr. Austin, and others. Mr. Thompson drove Mr. Franklin to the liquor store in Mr. Franklin's vehicle because Mr. Franklin did not have his driver's license. On the way back, they picked up Mr. Austin.

¶ 24    When they returned, everyone exited the vehicle. Then, Mr. Austin and Mr. Walker approached each other "again," argued in "each other['s] face[s]," and "holler[ed] back and forth" about "the dice or something like that." At some point, Ms. Wright arrived, and Mr. Franklin told her to "stay out of it." Mr. Franklin then heard somebody say, "ain't no talking, ain't no talking," and Mr. Walker shot Mr. Austin "[l]ike four" times. Mr. Franklin was approximately 10 feet from

Mr. Walker when he saw Mr. Walker shoot Mr. Austin. Mr. Franklin then moved to Mr. Austin, who was holding his chest, and "grabbed" him before the ambulance arrived.

¶ 25     On September 24, 2013, Mr. Franklin went to the police station with Ms. Perkins and identified Mr. Walker as the shooter to Detective Mancuso. On May 7, 2014, Mr. Franklin provided a videotaped statement to an ASA. Mr. Franklin did not recall saying that Ms. Wright said, "ain't no talking," when Mr. Walker and Mr. Austin were arguing. Mr. Franklin also did not recall saying that Mr. Walker said, "[w]hich of you b*** a*** n*** is next," before BD took the firearm from him.

¶ 26     On August 14, 2014, Mr. Franklin testified before the grand jury. Mr. Franklin did not recall testifying that Mr. Walker said he lost money in a dice game while Mr. Walker was arguing with Mr. Austin. The State published Mr. Franklin's grand jury testimony where he told the grand jury that, during the argument, Mr. Walker reached into his right pocket, drew a silver .38-caliber revolver, and "started shooting." Mr. Franklin testified that Mr. Walker and Mr. Austin argued about "somebody" losing money, but Mr. Franklin did not know who won or lost the game. Mr. Franklin told the grand jury that he was three or four feet from Mr. Walker when Mr. Walker shot Mr. Austin, and Mr. Walker said, "what's that s*** you was talking." Mr. Franklin also testified before the grand jury that after Mr. Walker shot Mr. Austin multiple times, Mr. Walker said, "which one of you b*** a*** n*** is next."

¶ 27     On cross-examination, Mr. Franklin stated that he was addicted to ecstasy at the time of the incident and drank "a lot" of alcohol. On the night of the shooting, he drank "a lot" and consumed 2 or 2½ pills of ecstasy. He spoke with defense counsel outside the courtroom on February 20, 2019, with defense counsel's partner and law clerk Elena Morgan present. Mr. Franklin denied telling defense counsel that he did not know whether Mr. Austin had a firearm

that night, and instead, told counsel that he "didn't know what was going on *** they was arguing, threatening."

¶ 28                    4. Devontae Thompson

¶ 29    Devontae Thompson testified that he lived outside of Chicago, had a degree in business administration, and was employed as a security officer. He lived on the west side of Chicago on September 20, 2013, and had known Mr. Austin and Mr. Walker for "20-plus years."

¶ 30    Around 11:30 p.m. on September 19, 2013, Mr. Thompson and Mr. Franklin left the gathering to go to the liquor store, with Mr. Thompson driving Mr. Franklin's vehicle. On the way back, Mr. Franklin received a call from Mr. Austin, and Mr. Thompson drove to pick him up. When they returned to the gathering, Mr. Franklin and Mr. Austin exited the vehicle and Mr. Thompson parked. Mr. Franklin walked over to talk to Ms. Wright while Mr. Austin walked toward Mr. Walker, and they began arguing. Mr. Thompson did not see Mr. Austin become physical with Mr. Walker, or Mr. Franklin involve himself in the fight, but saw Mr. Austin remove his shirt. Mr. Thompson did not have a weapon and did not see any weapons on Mr. Franklin, Mr. Austin, or in the vehicle.

¶ 31    After Mr. Thompson parked, Mr. Walker removed a silver firearm from his right side and shot at Mr. Austin's "upper body" three or four times. Mr. Austin attempted to run from Mr. Walker, who continued firing. Mr. Austin collapsed. Mr. Walker then said, "[w]ho's next? Who's next." BD took the firearm from Mr. Walker, who ran. Mr. Thompson grabbed Mr. Walker and said, "do you know what you just did?"

¶ 32    On April 17, 2014, Mr. Thompson went to the police station, met with Detective Mancuso and an ASA, and provided a videotaped statement. On August 15, 2014, Mr. Thompson appeared before a grand jury. When the State asked Mr. Thompson why he was "here today," Mr. Thompson

answered, "[r]ight is right. Wrong is wrong. That's the only reason I'm here."

¶ 33    On cross-examination, Mr. Thompson stated that Mr. Austin and Mr. Walker were approximately the same height and weight, around "five-seven" and "140" pounds. Mr. Thompson was six feet, two inches tall, and approximately 210 pounds on the day of the incident. After Mr. Franklin received the phone call from Mr. Austin, they returned to the gathering to confront Mr. Walker. Mr. Thompson denied telling the grand jury that Mr. Austin "got to shooting."

¶ 34    On redirect examination, Mr. Thompson testified that Mr. Franklin received a phone call from Mr. Austin, who stated that he had a "verbal argument" with Mr. Walker. They returned to the scene to "diffuse the problem" by "talk[ing] it out like [they] always do."

¶ 35              5. Assistant State's Attorneys and Law Enforcement

¶ 36    ASA Deborah Lawler testified that on September 10, 2014, she spoke with Ms. McCallum and Detective Mancuso and then took Ms. McCallum's videotaped statement. Ms. McCallum never told ASA Lawler that Mr. Austin, Mr. Franklin, and Mr. Thompson exited the vehicle "aggressively," or looked like they would attack Mr. Walker.

¶ 37    ASA Paul Joyce testified that he spoke with Mr. Franklin, Mr. Thompson, and Ms. Perkins on separate occasions. ASA Joyce did not believe that Mr. Franklin was under the influence of alcohol or narcotics during the interview, which was videotaped. The State published a segment of the statement, which ASA Joyce identified. The segment is included in the record on appeal and has been viewed by this court.

¶ 38    In the segment, Mr. Franklin describes returning from the liquor store with Mr. Austin and Mr. Thompson. Mr. Franklin states that Mr. Austin and Mr. Walker began arguing when Ms. Wright intervened and said, "[a]in't no talking. Ain't no talking." Then, Mr. Walker removed a chrome "short-nosed .38 revolver" from his pocket and shot Mr. Austin, who grabbed his chest

and turned to escape Mr. Walker. Mr. Walker shot Mr. Austin several more times and said, "which one of you b*** a*** n*** next." BD took the firearm from Mr. Walker, who "jumped in" a vehicle with "his cousin" and left.

¶ 39    Chicago police detective Ross Takaki testified that he went to the scene and searched for "firearm evidence," but did not discover shell casings or firearms. Detective Takaki commented that shell casings are not ejected from a revolver. Detective Takaki discovered a red stain on the sidewalk, which he believed was blood.

¶ 40    Detective Mancuso testified that on September 24, 2013, he met with Mr. Franklin and Ms. Perkins, who identified Mr. Walker as the offender. Detective Mancuso did not believe Mr. Franklin was under the influence of drugs or alcohol. On September 10, 2014, Detective Mancuso interviewed Ms. McCallum, who told him that Mr. Thompson exited the vehicle "aggressively" with Mr. Austin. She believed they would "jump on" Mr. Walker.

¶ 41    On July 17, 2014, Detective Mancuso learned that Mr. Walker had been arrested in Mississippi. On July 31, 2014, Detective Mancuso arrested Ms. Wright for her involvement in the homicide. Ms. Wright was subsequently released without being charged.

¶ 42    On cross-examination, Detective Mancuso stated that Ms. Perkins informed him that when Mr. Austin, Mr. Franklin, and Mr. Thompson returned from the liquor store, Mr. Austin pushed Mr. Walker into a fence and "there was a little shoving."

¶ 43                                      6. Stipulations

¶ 44    The State introduced the stipulated testimony of several witnesses.

¶ 45    Assistant medical examiner Dr. Steven White would testify that he performed an autopsy on Mr. Austin's body. Dr. White found three gunshot wounds on Mr. Austin's chest, hip, and thigh, with two wounds coursing from front to back, and the third coursing from left to right. The

manner of death was homicide.

¶ 46    Evidence technician James McDonough would testify that he received a bullet removed from Mr. Austin's body and sent it to the Illinois State Police crime laboratory for testing. Forensic scientist Dana Pratt would testify that she examined the bullet and determined that it was "of .38 caliber class."

¶ 47    Lastly, ASA Elizabeth Novy would testify that she presented Mr. Franklin to the grand jury. There, Mr. Franklin testified that when Mr. Austin exited the vehicle, Mr. Walker approached him and they argued because Mr. Walker lost money in a dice game. Mr. Franklin testified that Mr. Walker removed a revolver from his pocket and said, "what's that s*** you was talking."

¶ 48                                    B. The Defense's Case-in-Chief

¶ 49                                    1. Stipulation

¶ 50    The defense entered a stipulation that Melissa Reardon, an official court reporter, would testify that she transcribed the grand jury testimony of both Ms. Perkins and Mr. Thompson on August 14, 2014. According to Ms. Reardon, Ms. Perkins testified that "Little T skipped across the street, ran and pulled the gun out of his pants, and he started shooting." The next question was, "did you see [Mr. Walker] pull the gun out of his pants?" Ms. Perkins testified "yes." Further, Mr. Thompson testified that Mr. Walker "got to firing. He got to shooting it *** towards [Mr. Austin]. Little T got to shooting, hitting him like, two, three times." When asked what Mr. Thompson saw Mr. Austin do after Mr. Walker shot him, Mr. Thompson answered, "that's when he tried to grasp [*sic*] for air."

¶ 51                                    2. Elena Morgan

¶ 52    Ms. Morgan testified that she worked as a law clerk for defense counsels. On February 20, 2019, Ms. Morgan was outside the courtroom with defense counsels, who identified themselves to

Mr. Franklin and informed him they represented Mr. Walker. Counsels then asked Mr. Franklin about the events of September 20, 2013. Mr. Franklin stated that he did not know whether Mr. Austin had a firearm that day.

¶ 53    On cross-examination, Ms. Morgan stated that Mr. Franklin did not "really remember" what happened because the events were "four years ago." Mr. Franklin stated that he drank "a lot" that night and needed help "because he drinks a lot of alcohol" and uses ecstasy.

¶ 54                                3. Randon Walker

¶ 55    Mr. Walker testified that from late September 19 to early September 20, 2013, he played dice with Ms. Perkins and others. They moved to the 3600 block of West Augusta Boulevard and continued gambling and drinking. Everyone was intoxicated. At one point, Mr. Thompson and Mr. Franklin left.

¶ 56    Mr. Walker played dice with Mr. Austin and a person named Shakira Riddle, and the game got "a little heated" as Mr. Walker began winning. The three of them were "talking trash," when Mr. Austin hit Mr. Walker's left jaw. Mr. Walker "rushed" Mr. Austin and attempted to hit him, unsuccessfully. Mr. Austin then grabbed Mr. Walker and pushed him against a fence. Ms. Perkins and Ms. Riddle stepped between them, and Mr. Walker told Mr. Austin, "let's just talk, let's just walk it off and talk about it." Mr. Austin responded, "I don't want to talk to your b*** a***."

¶ 57    When Mr. Franklin and Mr. Thompson returned, Mr. Austin "jump[ed] in the back seat" of the vehicle and they drove away. Mr. Walker then walked "up the street" to "cool off," but returned approximately two minutes later. Mr. Walker and Ms. Perkins then walked toward Mr. Walker's mother's house. Mr. Thompson, Mr. Franklin, and Mr. Austin lost approximately $2000 to Mr. Walker, who was carrying the money and had a firearm for protection.

¶ 58    As Mr. Walker and Ms. Perkins were walking, Mr. Franklin's vehicle arrived speeding,

stopped, and "all three jumped out." Mr. Thompson stepped in front of Mr. Walker and Mr. Franklin stood behind him. Mr. Austin stood in the street holding a firearm in his right hand pointed at the ground. Mr. Austin told Ms. Perkins to get out of the way because they were "going to do this now." While this occurred, Ms. Wright arrived with Ms. McCallum; Mr. Walker never heard Ms. Wright say "ain't no talking, ain't no talking."

¶ 59    Mr. Thompson pushed Ms. Perkins out of the way, so Mr. Walker removed his firearm and shot Mr. Austin because he was afraid Mr. Austin would kill him. Mr. Walker never pointed the firearm at Mr. Thompson or Mr. Franklin, said "which one of you n *** wants it next," or handed the firearm to anyone. Mr. Walker then went to his mother's house with Ms. Perkins and told her what happened. Mr. Walker cried because he had never shot anyone and "was afraid that he was hurt." He and Ms. Perkins went with Ms. Wright to a hotel, and in the morning, Mr. Walker traveled to Mississippi because he was afraid.

¶ 60    On cross-examination, Mr. Walker stated that he went to the hotel because he was afraid that Mr. Franklin and Mr. Thompson would hurt him. That night, Mr. Walker "was twisting and turning," but he mostly slept well and woke at 10 a.m. He disposed of the firearm in a sewer because he was afraid. Mr. Walker was not injured when Mr. Austin pushed him against the fence. When Mr. Walker and Mr. Austin were "squaring off," Mr. Austin said, "I'm gonna shoot the s*** out of you. I'm going to kill you." Mr. Walker told him, "just leave it alone. We would talk it out. I ain't talking s*** out." Then, Mr. Walker drew his firearm and began shooting. Mr. Walker acknowledged that he did not have a firearm owners identification (FOID) card and had been convicted for possession of a controlled substance.

¶ 61                    C. Closing Arguments and Verdict

¶ 62    In closing, the prosecutor argued that Mr. Walker killed Mr. Austin because he was angry

at losing dice, not in self-defense.

¶ 63    Defense counsel argued that the State's witnesses lied and contradicted themselves. Mr. Franklin had numerous convictions and was "a self-admitted addict," and Mr. Thompson was "not much better." Further, Ms. Perkins and Mr. Thompson separately testified before the grand jury that Mr. Austin had a firearm. Mr. Walker, in contrast, "was the sole witness that went completely unimpeached."

¶ 64    Counsel contended that the State's theory that Mr. Walker shot his friend for "absolutely no reason" was preposterous; rather, Mr. Franklin, Mr. Thompson, and Mr. Austin planned to rob or kill Mr. Walker. Counsel additionally argued that Ms. Perkins voluntarily left the scene of the shooting with Mr. Walker, which was consistent with Mr. Walker acting in self-defense. Further, Mr. Thompson testified that he was "a big guy," physically larger than Mr. Walker, and counsel questioned why Mr. Thompson and Mr. Franklin waited to speak with police officers about the incident. Defense counsel argued that if Mr. Walker did not have a firearm, he would have been killed. Lastly, defense counsel argued that Mr. Walker was not happy that Mr. Austin was dead and cried to his mother about the situation.

¶ 65    In rebuttal, the prosecutor commented that defense counsel "pick[ed]" the parts of the testimony "he like[d]." Regarding Mr. Walker's testimony, the prosecutor noted, "honestly, I thought for a second that he walked into the wrong courtroom and he was at the wrong trial because it was that removed from the reality of what we sat through in the early part of the case." According to the prosecutor, Mr. Franklin "had a hard time telling the *** full truth" because Mr. Walker was his friend, and omitting the "really damning stuff" was his "west side 'I'm sorry' " to Mr. Walker. Over defense counsel's objections, the prosecutor noted that Mr. Franklin's "baby momma" was Ms. Wright, who had been arrested for her involvement in the murder, and acted as "an accessory

after the fact" for assisting Mr. Walker to "get away."

¶ 66    The prosecutor commented that even if Mr. Walker and Mr. Austin physically fought, Mr. Walker was not justified in shooting Mr. Austin, and thus told an "absurd tale of the assassination attempt" against him. The prosecutor argued that Mr. Thompson drove the vehicle because Mr. Franklin did not have a driver's license, and defense counsel had previously noted that Mr. Thompson was "a big guy," and "big as a house," so "they" had to characterize Mr. Thompson as a passenger to "get [him] into the fight" faster. The prosecutor noted that Mr. Thompson went to college, had a job, "lives in the suburbs," and is a peacemaker, "not exactly the guy they promised you."

¶ 67    In discussing Ms. McCallum's testimony, the prosecutor commented that her use of the word "aggressively" was "an interesting word for her to have chosen. It's such a legal word, like somebody kind of told [her] to maybe use a word like that." Further, the "impeachment" that defense counsel raised was "laughable because everybody is right on all of the important stuff." The prosecutor noted that no evidence established that Mr. Austin had a firearm, and defense counsel's attempt to impeach Ms. Perkins with the grand jury testimony relied on transcription errors. The prosecutor further commented:

> "I think [Mr. Walker's] version of the story is completely ludicrous that these three guys decide to just like, kill him because they're not even saying give us your money. I mean, he doesn't say that. I mean, that would make it more interesting. Counsel is trying to spin it. It's like, no they're like step away, like we are going to kill him. We don't want his money. We're just going to kill him. Like it's something out of the movies."

¶ 68    When discussing Ms. Perkins, the prosecutor noted that he "didn't know what [Ms. Perkins] was going to say when she took the stand," because she was conflicted due to her

relationship with Mr. Walker. However, Ms. Perkins's story was "dead on" and "buries" Mr. Walker. The prosecutor also stated that Ms. Perkins testified that Mr. Walker said, "if [Mr. Austin] doesn't die, I'm going to stop popping pills."

¶ 69    The prosecutor prefaced many statements during rebuttal with "I think" or "I submit," including commenting that "I think" Mr. Walker told the truth at times and felt "bad" about shooting Mr. Austin because Mr. Walker feared going to jail. The prosecutor stated, "I submit [Mr. Walker] went to get the revolver before he came back to the dice game," and "I think" that Ms. Perkins was "in shock" after Mr. Walker shot Mr. Austin, which explained why she left the scene with him. The prosecutor additionally commented that Mr. Walker stated that he "got a good night sleep" that evening "[b]ecause that's what killers do *** they are not bothered by this. All of a sudden the stress just went right out of his body."

¶ 70    In arguing to the jury that Mr. Walker did not act in self-defense, the prosecutor described a hypothetical scenario where "Joe Commuter" arrived at Union Station from the suburbs and met a panhandler. The commuter reached into his pocket to "give the guy a dollar," and the panhandler "stab[bed] him to death." The prosecutor concluded the hypothetical by saying: "That is not reasonable; okay?"

¶ 71    Regarding the credibility of the witnesses, the prosecutor stated:

>        "My partner touched on the fact that you might not love these witnesses. Yeah, they're characters, but you know, the people who come to this courthouse, you know, there's concrete statutes, there's Latin phrases. You know, we're all familiar with the idea of, you know, Lady Justice, blindfold, fate of people. And the blindfold represents the fact that, you know, objectivity, fairness, everybody is going to be treated the same way.

***

They come from all economic classes, all education levels. And the reality is, though, it's the same law that applies on the west side as applies in your zip code. The law is the same."

¶ 72    The court instructed the jury, in relevant part, that neither opening statements nor closing arguments were evidence, and "any statement or argument made by the attorneys which is not supported on the evidence should be disregarded." The court also instructed the jury that "[a] person is justified in the use of force when *** he reasonably believes that such conduct is necessary to defend himself[.] *** The phrases 'reasonable belief' or 'reasonably believes' mean that the person concerned acting [*sic*] as a reasonable person."

¶ 73    The jury found Mr. Walker guilty of first degree murder.

¶ 74    Defense counsel filed a motion for a new trial, arguing in relevant part that the prosecutor "made prejudicial, inflammatory, and erroneous statements in closing argument designed to arouse the prejudices and passions of the jury." Defense counsel subsequently filed an amended motion, arguing in part that the prosecutor improperly asserted his personal beliefs and suggested that defense counsel was trying to deceive the jury, and the court erred in overruling defense objections to the prosecutor's statements regarding Ms. Wright's involvement in the murder. The court denied the motions.

¶ 75    After a hearing, the court sentenced Mr. Walker to 45 years in prison. Mr. Walker did not file a motion to reconsider his sentence.

¶ 76                                    II. JURISDICTION

¶ 77    Mr. Walker was sentenced on August 23, 2019, and he timely filed his notice of appeal that same day. We have jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 and 606, governing appeals

from final judgments of conviction in criminal cases (Ill. S. Ct. R. 603 (eff. Feb. 6, 2013), R. 606 (eff. Dec. 11, 2014)).

¶ 78                                    III. ANALYSIS

¶ 79    On appeal, Mr. Walker argues that he is entitled to a new trial due to prosecutorial misconduct during rebuttal closing arguments. While we agree with Mr. Walker that some of the prosecutor's comments were not proper, we do not think any of them necessitate a new trial in this case.

¶ 80    During closing argument, prosecutors have a great deal of latitude to comment upon and draw reasonable inferences from the evidence presented. *People v. Blue*, 189 Ill. 2d 99, 127 (2000). Closing arguments must be viewed in their entirety, and the allegedly improper argument must be considered in context. *Id*. at 128. In reviewing comments made during closing arguments, we ask whether the comments "engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilty resulted from them." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). We should grant a new trial if the jury could have reached a contrary verdict had the prosecutor not made the improper comments or we cannot determine whether the prosecutor's improper remarks contributed to the defendant's conviction. *Id*.

¶ 81    In *Wheeler*, our supreme court held that the *de novo* standard applies, and in *Blue*, the court had said the issue is reviewed for an abuse of discretion. One decision of this court has reconciled these cases by finding that reviewing courts should apply an abuse of discretion standard in reviewing the trial court's rulings on whether the closing argument was proper but review *de novo* the legal issue of whether improper remarks were so egregious that they warrant a new trial. *People v. Cook*, 2018 IL App (1st) 142134, ¶¶ 63-64; but see *People v. Phagan*, 2019 IL App (1st) 153031, ¶ 54 (finding these cases to be in conflict and applying the *Blue* abuse of discretion standard). We

need not fully resolve the question of the extent to which each of these standards apply in this case. In our view, these comments do not necessitate a new trial under either standard.

¶ 82    As a preliminary matter, only one of these objections to the prosecutor's closing argument has been fully preserved as an issue on appeal. To preserve an issue for appeal, a defendant must object to the purported error at trial and include it in a written posttrial motion. *People v. Glasper*, 234 Ill. 2d 173, 203 (2009). Mr. Walker concedes that he only contemporaneously objected to the prosecutor's comments regarding Ms. Wright's arrest and accountability for the offense. Although Mr. Walker included additional claims in his posttrial motions, those arguments were not properly preserved because there was no contemporaneous objection. See *id.*

¶ 83    With respect to Mr. Walker's argument regarding the prosecutor's statements about Ms. Wright, the record shows that the prosecutor commented fairly upon the evidence regarding Ms. Wright assisting Mr. Walker, and upon Mr. Franklin's credibility given Ms. Wright's involvement in the case. Specifically, after Mr. Walker shot Mr. Austin, Ms. Wright met Mr. Walker at his mother's house and drove him to a hotel. See *People v. Pasch*, 152 Ill. 2d 133, 184-85 (1992) (finding no reversible error where the majority of the complained-of remarks were based on reasonable inferences from the evidence or were not so prejudicial as to amount to reversible error). Further, defense counsel argued in closing argument that Mr. Franklin lied, and the prosecutor was thus permitted to respond to this argument in view of Ms. Wright and Mr. Franklin's relationship. See *Glasper*, 234 Ill. 2d at 204-05. Accordingly, we find the prosecutor did not impermissibly express his personal opinions regarding Ms. Wright's involvement with the case.

¶ 84    Mr. Walker contends that we should review his remaining claims of improper comments during argument under the plain-error exception to the forfeiture rule or, alternatively, as ineffective assistance of counsel.

¶ 85    Under the plain-error doctrine, we may consider an unpreserved error when a clear or obvious error occurs and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The first step is determining whether an error occurred. *People v. Cosby*, 231 Ill. 2d 262, 273 (2008). Absent an error, there can be no plain error. *Id*.

¶ 86    Mr. Walker argues that the prosecutor repeatedly expressed his personal opinions during rebuttal argument, prefacing many statements with "I think" and "I submit." In particular, the prosecutor commented that he believed Mr. Walker "walked into the wrong courtroom" when Mr. Walker testified, commented that Ms. Perkins was in shock as to why she spent the night with Mr. Walker, and offered his opinion regarding Mr. Franklin having "a hard time" telling the truth at trial in part due to Ms. Wright's involvement in the incident. Mr. Walker also argues that the prosecutor mischaracterized Ms. Perkins's testimony by stating that Mr. Walker said he would "stop popping pills" if Mr. Austin survived.

¶ 87    It is improper for a prosecutor to express his personal opinions or argue facts not based on the evidence. *People v. Johnson*, 119 Ill. 2d 119, 143 (1987). Here, however, although the prosecutor prefaced several statements with "I think" or "I submit," in context, the prosecutor was merely raising inferences supported by the trial evidence. See *People v. Emerson*, 122 Ill. 2d 411, 434-35 (1987) (when viewed in context, remarks prefaced by "we know" were fair comments on the evidence). Further, the prosecutor's comments that Ms. Perkins could have been in shock when she left the scene with Mr. Walker and Mr. Franklin's state of mind while testifying due to Ms. Wright's involvement were subjects of common sense, and thus proper. See *People v. Runge*, 234

- 19 -

Ill. 2d 68, 146 (2009) ("[S]ince this court has acknowledged that jurors do not leave their common sense behind when they enter court, it would seem proper for prosecutors to couch arguments in those terms and make appeals thereto." (citation omitted)).

¶ 88    We agree that the prosecutor misstated the evidence in commenting about Mr. Walker's purported statement that he would "stop popping pills" if Mr. Austin survived. Rather, Ms. Perkins testified that Mr. Walker stated that he would "push [his] life around," and did not mention pills.

¶ 89    Closing arguments cannot be based on a misstatement of the evidence. *Phagan*, 2019 IL App (1st) 153031, ¶ 56. Notwithstanding, "[a] single misstatement does not necessarily deprive a defendant of a fair trial unless the remark 'result[s] in substantial prejudice to the defendant and constitute[s] a material factor in his conviction.' " *Id.* (quoting *People v. Brooks*, 345 Ill. App. 3d 945, 951 (2004)). The trial court may cure errors by properly instructing the jury that arguments are not evidence and must be disregarded if not supported by the trial evidence. *People v. Simms*, 192 Ill. 2d 348, 396-97 (2000). Here, the trial court instructed the jury appropriately, and thus this erroneous fleeting remark did not prejudice Mr. Walker. Therefore, the misstatement did not constitute plain error. See *Piatkowski*, 225 Ill. 2d at 565.

¶ 90    Mr. Walker also argues that the State repeatedly disparaged defense counsel in stating that the defense theory was "completely ludicrous" and defense counsel was "trying to spin it." Mr. Walker maintains that the prosecutor's use of "they" to refer to defense counsel, and comments regarding Ms. McCallum's testimony that Mr. Austin, Mr. Franklin, and Mr. Thompson approached Mr. Walker "aggressively," attacked counsel's integrity. To the last point, Mr. Walker contends that the prosecutor's comment that "aggressively" was a "legal" word that "somebody" could have told Ms. McCallum to use effectively accused defense counsel of suborning perjury.

¶ 91    The State may challenge a defendant's credibility and the credibility of the defense theory

where the evidence supports such a challenge. *People v. Kirchner*, 194 Ill. 2d 502, 549 (2000). However, "[a]ccusing counsel of fabricating a defense is improper unless the accusation is based on competent evidence." *People v. Potts*, 2021 IL App (1st) 161219, ¶ 242.

¶ 92    The record demonstrates that the prosecutor did not cross the line into a false accusation of fabricating a defense. The prosecutor did say that the defense theory was "completely ludicrous," and that defense counsel was attempting to "spin it." These were legitimate attacks on the defense theory rather than improper attacks on defense counsel. See *id.* ¶ 244; *People v. Hudson*, 157 Ill. 2d 401, 442-43 (1993) (although the prosecutor used the word "concoct" to refer to the defense theory, such comments "do not sufficiently refer to defense counsel or attribute any particular wrongdoing to him"). Here, in context, the prosecutor commented that Mr. Walker's testimony that Mr. Austin, Mr. Franklin, and Mr. Thompson decided to kill Mr. Walker, rather than rob him, was "ludicrous," and "something out of the movies," and that defense counsel attempted to "spin" Mr. Walker's testimony to suggest that Mr. Austin, Mr. Franklin, and Mr. Thompson intended to rob Mr. Walker. The prosecutor's comment did not ascribe wrongdoing to defense counsel or accuse counsel of fabricating a defense, but rather, was "directed to the credibility of [the] defendant." See *Hudson*, 157 Ill. 2d at 443.

¶ 93    Additionally, the record does not support the contention that the prosecutor was accusing defense counsel of suborning perjury or fabricating a defense by informing Ms. McCallum to use the word "aggressively." The prosecutor only stated that "somebody" told Ms. McCallum to use such a "legal" word, but did not assert that counsel did so. See *Potts*, 2021 IL App (1st) 161219, ¶¶ 243-45. In context, the prosecutor's comments focused upon the credibility of the defense theory rather than disparaging defense counsel.

¶ 94    The argument that we find most persuasive is Mr. Walker's claim that the prosecutor made

inflammatory remarks "designed to engender the jury's bias against [Mr. Walker] and his community on the West Side of Chicago." Mr. Walker asserts that the prosecutor's comments about Mr. Franklin's "west side 'I'm sorry,' " hypothetical regarding a panhandler stabbing a commuter, and remarks that the "same law" applied in the "west side as applies in your zip code," were designed to create a conflict between Mr. Walker's community and the jurors. Mr. Walker also argues that the prosecutor's comment bolstering Mr. Thompson's credibility because he "lives in the suburbs" added to this tactic.

¶ 95    Closing arguments "must serve a purpose beyond inflaming the emotions of the jury." *Wheeler*, 226 Ill. 2d at 128. To that end, it is improper for a prosecutor to use closing argument to create an "us-versus-them" mentality inconsistent with the nonpartisan role of a jury. *Id.* at 129. "A prosecutor does not engage in misconduct *** simply because the prosecutor dwells upon the evil results of crime and urges the fearless administration of justice." *People v. Desantiago*, 365 Ill. App. 3d 855, 864 (2006). However, the prosecution must not focus on the broader problems of crime in society or engage in "an extended and general denunciation of society's ills." (Internal quotation marks omitted.) *People v. Deramus*, 2014 IL App (1st) 130995, ¶ 55.

¶ 96    Here, the prosecutor referenced the "west side" of Chicago several times in rebuttal. In particular, the prosecutor commented that the inconsistencies in Mr. Franklin's testimony were his "west side 'I'm sorry,' " and distinguished the "zip code" of the witnesses from that of the jurors. These comments improperly emphasized the distinction between Mr. Walker and the State's witnesses and the jury, risking an "us-versus-them" mentality. See *Wheeler*, 226 Ill. 2d at 129.

¶ 97    "[A] pattern of intentional prosecutorial misconduct may so seriously undermine the integrity of judicial proceedings as to support reversal under the plain-error doctrine." *People v. Johnson*, 208 Ill. 2d 53, 64 (2003) As noted, however, the trial court properly instructed the jury

- 22 -

that comments made in closing are not evidence. This instruction helps to cure prejudice from improper closing remarks. See *Simms*, 192 Ill. 2d at 396-97. The improper comments in this case were limited and did not establish a "pervasive pattern of unfair prejudice" that undermined the integrity of the verdict so as to support Mr. Walker's claim under the second prong of the plain error doctrine. (Internal quotation marks omitted.) See *Johnson*, 208 Ill. 2d at 64.

¶ 98    This improper argument cannot support a claim of first prong plain error either because the evidence was not closely balanced. The State's witnesses testified that early on September 20, 2013, Mr. Walker and Mr. Austin played dice and became involved in an altercation culminating in Mr. Walker shooting Mr. Austin several times. After one night in a hotel, Mr. Walker fled to Mississippi. None of the State's witnesses testified at trial that they saw Mr. Austin with a weapon, and their testimonies were substantially consistent regarding the events of the evening, including comments made by Mr. Walker and the bystanders. Although defense counsel impeached Ms. Perkins, Mr. Franklin, and Mr. Thompson with their grand jury testimonies, none of the inconsistencies were significant. Rather, they primarily included statements regarding whether Mr. Austin had a firearm, which all the witnesses, except Mr. Walker, ultimately denied. Because the evidence was not closely balanced, the prosecutor's comments do not rise to the level of plain error.

¶ 99    Lastly, Mr. Walker argues that the prosecutor attacked him for his testimony that he got a "good night sleep" after the shooting because "that's what killers do." Mr. Walker contends that this comment was an unfair characterization of his testimony and had the sole effect of inflaming the juror's emotions.

¶ 100  We disagree. Here, the prosecutor's statement that Mr. Walker got a "good night sleep" directly responded to defense counsel's argument that Mr. Walker was upset following the

incident. Since defense counsel's argument addressed Mr. Walker's emotional state, it was permissible for the prosecutor to respond in rebuttal. See *Glasper*, 234 Ill. 2d at 204-05. The prosecutor's comment "that's what killers do," although an "unflattering 'appellation,' " is supported by the evidence, as there was no question that it was Mr. Walker who shot and killed Mr. Austin. See *Potts*, 2021 IL App (1st) 161219, ¶¶ 291-92 ("unflattering 'appellations' are not improper where they are supported by the evidence or a reasonable inference from the evidence"). We find no reversible error with respect to this claim.

¶ 101    Mr. Walker also contends that defense counsel was ineffective for failing to preserve the issues pertaining to prosecutorial misconduct. To succeed on a claim of ineffective assistance of counsel, Mr. Walker must show (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Here, Mr. Walker is unable to establish prejudice because, as noted, the errors did not affect the verdict. See *People v. Johnson*, 218 Ill. 2d 125, 144 (2005) (where the prosecutor's comments did not deny the defendant a fair trial, he was not prejudiced by counsel's failure to object). Thus, Mr. Walker's ineffective assistance claim fails.

¶ 102                                   IV. CONCLUSION

¶ 103    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 104    Affirmed.